FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

00 JUL 31

U.S. DISTRICT COURT
N.D. OF ALABAMA

JANICE R. ELLEN,           )
                           )
        Plaintiff,         )
                           )
v.                         )      Case No. CV-99-TMP-494-M
                           )
CITY OF GADSDEN, ALABAMA;  )
and FRED SINGTON, JR.,     )
                           )      **ENTERED**
        Defendants.        )
                                  JUL 3 1 2000


                    **MEMORANDUM OPINION**

        This action is before the court on the motion for summary

judgment filed March 31, 1999 by the defendants, the City of

Gadsden and Fred Sington, Jr.  Plaintiff Janice Ellen responded to

the motion by filing a brief in opposition and supporting exhibits

on May 4, 2000.  The defendants submitted a reply brief on May 25,

2000, and the plaintiff, by motion, filed a sur-reply on June 2,

2000.  The court heard oral argument on the defendant's motion on

June 26, 2000.  All parties have consented to the exercise of

jurisdiction by the undersigned pursuant to 28 U.S.C. § 636(c).

For the reasons set forth herein, the defendants' motion for

summary judgment is due to be denied in part and granted in part.



## I. SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. Celotex, 477 U.S. at 322-23. There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials negating the opponent's claim." Id. at 323.

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own

2

affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324 (quoting Fed. R. Civ. P. 56(e)). The nonmoving party need not present evidence in a form necessary for admission at trial; however, she may not merely rest on her pleadings. Celotex, 477 U.S. at 324. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

After the plaintiff has properly responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The substantive law will identify which facts are material and which are irrelevant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. His guide is the same standard necessary to direct a verdict: "whether

3

the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52; see also Bill Johnson's Restaurants, Inc. v. N.L.R.B., 461 U.S. 731, 745 n.11 (1983). However, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. Anderson, 477 U.S. at 249 (citations omitted); accord Spence v. Zimmerman, 873 F.2d 256 (11th Cir. 1989). Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. Anderson, 477 U.S. at 254; Cottle v. Storer Communication, Inc., 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the non-movants is to be believed and all justifiable inferences are to be drawn in his favor. Anderson, 477 U.S. at 255. The non-movant need not be given the benefit of every inference but only of every reasonable inference. Brown v. City of Clewiston, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

4

## II.  FACTS

Viewing the evidence in the light most favorable to the plaintiff, the following undisputed facts are relevant to the instant motion.  Ellen was hired by the City of Gadsden in 1976. She worked with the Gadsden Department of Parks and Recreation at the Noccalula Falls Park for 22 years, until she resigned in April of 1998.  During most of the time between her hiring in 1976 until February of 1998, Ellen ultimately reported to Jerry Alford, the director of parks and recreation for the city.[1]  During all of Ellen's career, she worked at the department's Noccalula Falls Park.  From 1983 until she resigned, Ellen was classified as a secretary, although she also performed managerial duties during much of her tenure, supervising other employees and handling the hiring of workers for the concession stand and souvenir shop.

In 1993, the city began supplementing Ellen's secretarial salary to compensate her for the extra duties she took on during the park's busy summer months.  The extra compensation was paid only during the busy summer months; the rest of the year she received the basic secretary salary.  In 1996, however, the city expanded the supplement to provide the supplemental pay throughout the year.

---

[1]     Ellen at times also reported directly to Jerry Gladden, David Miller, and Barney Thrasher, but those supervisors are not relevant to this motion.

Defendant Fred Sington was hired by the city in 1993, working initially at the city airport. Beginning in January of 1995, Sington became the manager of the Noccalula Falls Park and was Ellen's direct supervisor. He remained in that position for approximately three months until April 1995, when he was reassigned to the mayor's office downtown as a special assistant to the mayor. Although, as a special assistant, Sington remained in authority over Ellen, her direct supervisor was the director of parks and recreation, who for the most part, as mentioned, was Jerry Alford. Sington had occasional, and sometimes daily, telephone contact with Ellen and made occasional visits to the Falls park, but he no longer had daily personal contact with plaintiff or daily direct supervision over her after April 1995.

In February of 1998, Alford retired as director of the parks and recreation department and Sington was named the acting parks and recreation director. Upon assuming the new position, Sington again became Ellen's direct supervisor.

When Sington became the department manager, he made many changes in the organization of the department. He reclassified Ellen from secretary with a managerial supplement to the position of facilities manager II. The change eliminated Ellen's salary supplement, causing an overall decrease in her pay.[2] Ellen was to

_____

[2] Alford has testified, however, that the supplement was designed to compensate Ellen for overtime hours worked, and that

6

report to Sandy Battles, the department's recreation planner, who reported in turn to Sington.

After the reorganization was announced, Ellen was given a list of new job "commands" and was called into a series of meetings. Either through the meetings or the list, Ellen was "threatened" with having to work at another facility in a neighborhood she considered unsafe, working late at night, and having to perform other, new duties. Battles told Ellen that per Sington's orders, Ellen could not call or visit city hall, and would have to order supplies through a part-time worker. Ellen complained to Jerry Gladden, the city personnel director, who told her to come to him if she was told to perform the new duties. In fact, Ellen was never required to perform any of the new duties discussed with her before she resigned, and Gladden testified that the change in duties would not have occurred. In none of these meetings, in which Gladden and plaintiff's union representatives were present, did Ellen mention the alleged harassment by Sington or allege that the reclassification was retaliatory in nature.

The same month that the reclassification was implemented, Ellen resigned. After her resignation, she met with the mayor of Gadsden on at least three occasions to discuss Sington's changes

---

in the new position, although Ellen would not receive a supplement, she would be eligible for overtime pay which, if she worked extra hours, would make up the difference in her pay.

7

and to negotiate a reinstatement to her job.  In none of these meetings did she accuse Sington of sexual harassment or allege that the reclassification was retaliatory.  Ellen ultimately rejected the city's offer to return her to employment.  She then filed an EEOC claim and ultimately commenced this lawsuit, asserting that she was a victim of sexual harassment and was fired in retaliation for opposing the harassment.

During the relevant period of time, Gadsden had in effect a policy against sexual harassment, first adopted by the city council in 1992.  The city distributed copies of the policy to all of its employees with their paychecks at least once a year between 1993 and 1997.  Ellen, however, maintains that she never received a copy of the policy and was unaware of its existence.  In addition to the specific sexual harassment policy, the employee handbook that plaintiff admits having a copy of contained the following provision:

**Section 19.  Discrimination Grievance**

(a) It is the policy of the City not to discriminate against an employee or an employee organization on account of race, creed, color, age, religion, **sex**, nationality, disability, veteran status, membership or non-membership in a union, except where age or sex is a bona fide occupational qualification.  If an employee believes that the City has discriminated against him in violation of that policy, then this grievance procedure shall be used.

(b) If the employee is unsuccessful in resolving the complaint at the supervisor level, the employee shall

contact the Personnel Director (who is also the Equal Opportunity Officer)to discuss the complaint. The Personnel Director shall contact all persons involved and attempt to resolve the complaint informally.

(c) If the complaint is not resolved informally, the aggrieved person shall file a formal written complaint with the Personnel Director within 14 working days after the informal disposition or failure to resolve. The complaint should set forth the facts which allege discrimination, the dates on which the alleged discriminatory action occurred, the dates of submission of the informal and formal complaints, the reason why any recommendations of the Mayor or City Council did not satisfactorily resolve the problem.

(d) Within 14 calendar days of receipt of the complaint, a hearing will be held by the Mayor or his designated representative(s). All proceedings of the hearing will be transcribed. A decision will be issued by the Mayor within 14 calendar days of the hearing.

(e) If all attempts to resolve the complaint fail, the Personnel Director will advise the aggrieved person of other channels where the issue may be pursued.

(f) Records of all such proceedings shall be maintained as part of the EEO complaint file.

Plaintiff's Exhibit 17, pp. 25-26 (bolding of the word "sex" added).

According to Ellen, the harassment by Sington began early in 1995. Sington frequently told lewd or off-color jokes or stories during conversations with Ellen and other employees. His jokes often included the words "fuck" and "blow job." Ellen would tell Sington to stop making such comments, but the comments continued on a daily basis. Sington also asked Ellen about her sexual relations with her husband, asking if Ellen had "put out" over the weekend

9

and if she had given her husband a "blow job". Sington also commented to Ellen about another park employee's weight and breast size. In addition, Sington told Ellen that he first had sexual intercourse when he was twelve or thirteen years old with a fifteen-year-old girl, although he did not relate to her any details. He also made remarks about his own relations with his wife, saying that she had "performed well." Plaintiff would simply tell Sington to shut his mouth and leave her alone.

On one occasion in 1995, Sington and Ellen were dismantling the coin boxes at a park concession and Sington was turning the screwdriver in the wrong direction. When Ellen told him he was "screwing" the "wrong way", he laughed and told her no one had ever told him that before and that he would love to "prove her wrong." On another occasion in 1995, Ellen was resting in Sington's office because she had a headache. Sington approached her from behind the chair in which she was seated and rubbed her shoulders, and she became upset and went home.

During Sington's three-month stint at the Falls park from January to April of 1995, Ellen told her friend Susan Abrahams, an employee in the personnel department of the city, about Sington's lewd comments. Abrahams advised Ellen to "leave it alone." There is no evidence that Abrahams had any authority to speak for the city or the personnel director; she spoke only as plaintiff's friend. After Sington left the park location to work in the

10

downtown office, Ellen told Alford that she was glad he was gone because she didn't like his "dirty mouth."   Sington often told jokes to co-workers, male and female, and many were off-color or sexually graphic.   Sington had a reputation as a joke-teller and as someone who liked to shock others.

After Sington went to work in the downtown office, some five or six miles from the Noccalula Falls Park, he continued to tell Ellen dirty jokes and to use explicit language during their phone conversations.   At Alford's retirement party early in February 1998, Sington told Ellen that he liked the form-fitting sweater she was wearing.   After the retirement party, Ellen again talked to Abrahams about Sington's conduct, and Abrahams told Ellen the city had no sexual harassment policy and that she should not complain to the personnel director.[3]   Abrahams advised Ellen to seek legal advice.   Ellen then heard that a reorganization of the department was underway or was being planned and that her duties and pay might be affected.   Ellen then contacted Ben Reed, a member of the Gadsden City Council.   Reed advised Ellen to complain to the mayor, but Ellen knew that Sington and the mayor were friends and believed that her complaint would serve no useful purpose.   Reed also suggested that Ellen consult an attorney.   There is no evidence

---

[3]   The court accepts this as true even though there is no corroborating testimony from plaintiff's friend, Ms. Abrahams.

that Reed ever mentioned the conversation with plaintiff to anyone else.

Ellen did not complain further to anyone within the department or city government about her problems with Sington.  Ellen never told the mayor or any other supervisor that she felt she was being sexually harassed until after she resigned.  Ellen alleges that she didn't complain because she was unaware of the policy prohibiting harassment, had been advised not to complain by her friend, Abrahams, and was afraid that the city would retaliate by firing her.

Ellen brought this action, alleging three claims arising under Title VII: (1) that Sington's conduct created a hostile work environment and constituted *quid pro quo* harassment, (2) that the city wrongfully retaliated against Ellen for voicing her opposition to Sington's conduct by decreasing her pay and changing her job assignments, and (3) that the city impermissibly discriminated against her by failing to promote her to personnel director.  Ellen also alleges three state-law claims: (1) that the defendants intentionally inflicted severe emotional distress upon Ellen[4], (2)

---

[4]     Ellen states this claim as both a claim for outrage under Alabama law, and a claim for intentional infliction of emotional distress.  However, under Alabama law, the two are not separate causes of action, and therefore are treated herein as a single claim based on the tort of outrage.

that the city negligently and/or maliciously supervised Sington, and (3) that the city constructively discharged Ellen.

### III.  DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants' motion for summary judgment seeks dismissal of all of plaintiff's claims.  The defendants first assert that the Title VII claims are untimely because the alleged actionable conduct occurred in 1995, more than three years before the plaintiff sought relief.  The defendants also assert that the Title VII hostile environment claim is due to be dismissed on the basis of the affirmative defense established in <u>Ellerth v. Burlington Industries</u>, 524 U.S. 742, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998) and <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998).  The defendants further contend that Ellen's claim alleging *quid pro quo* sexual harassment is due to be dismissed because Ellen does not claim that any job benefit or detriment was conditioned on her acceptance of any sexual demand.

The defendants argue that Ellen's Title VII retaliation claim is due to be dismissed because: (i) Ellen has failed to demonstrate any causal link between any "protected activity" and any adverse employment action; and (ii) the defendants have given a reason for her change in job assignments and pay and that reason has not been shown to be a pretext.  Similarly, with respect to Ellen's sex

13

discrimination claim, defendants assert that Ellen has failed to offer any evidence that she was treated differently from another employee because of her gender.

As to Ellen's state law claims, the defendants seek summary judgment on the outrage claim on the basis that the conduct complained of does not rise to the level of egregiousness necessary to be actionable under Alabama law.  Furthermore, the defendants seek dismissal of the negligent supervision claim because that action is time-barred and because there is no evidence that the city failed to adequately supervise Sington.  Finally, the defendants seek dismissal of Ellen's state law claim of constructive discharge on the basis that there is no causal link between the alleged harassment and the allegedly intolerable working condition.  Each claim will be examined in turn.

### A.  Title VII Sexual Harassment

#### 1.  Timeliness

The defendants correctly assert that Title VII requires a plaintiff to file a charge of discrimination with the EEOC within 180 days of the alleged violation and that failure to timely file is fatal to a Title VII claim.  The defendants also recognize that there exists an exception to the 180-day limitation for conduct that constitutes a continuing violation.  See, e.g., Roberts v.

14

Gadsden Mem. Hosp., 835 F.2d 793 (11th Cir. 1998).  The issue, then,
is whether the conduct complained of was part of a continuing
pattern of harassment that continued into the 180-day limitations
period.  The frequency of the conduct is one factor that is
relevant to a determination of whether the conduct may constitute
a continuing violation.

     In this case, Ellen has testified that even after Sington left
the Noccalula Falls office in 1995, her job required that she
maintain "constant" contact with him, both by phone and in person.
She has testified that the lewd comments, sexual questions, and
dirty jokes continued on almost a daily basis.  Viewing the
evidence in the light most favorable to the plaintiff, there is at
least a fact question whether Sington's alleged conduct constitutes
a continuing violation, and the time bar does not preclude Ellen's
claims.  Consequently, defendants' motion for summary judgment
cannot be granted on that basis.


             2.  Objectively Offensive

     In order to sustain a Title VII claim for sexual harassment
sufficient to create a hostile work environment, the plaintiff must
demonstrate, as one of the elements, that the work environment was
both objectively and subjectively offensive.  Faragher, 524 U.S.
775, 118 S.Ct. 2275, 2283.  The Eleventh Circuit has said:

                            15

> To establish a hostile-environment sexual-harassment
> claim under Title VII based on harassment by a
> supervisor, an employee must show: (1) that he or she
> belongs to a protected group; (2) that the employee has
> been subject to unwelcome sexual harassment, such as
> sexual advances, requests for sexual favors, and other
> conduct of a sexual nature; (3) that the harassment must
> have been based on the sex of the employee; (4) that the
> harassment was sufficiently severe or pervasive to alter
> the terms and conditions of employment and create a
> discriminatorily abusive working environment; and (5) a
> basis for holding the employer liable.

Mendoza v. Borden, Inc., 195 F.3d 1238, 1245 (11th Cir. 1999). An employer is vicariously liable to a victimized employee where the hostile environment has been created by a supervisor "with immediate (or successively higher)" authority over the employee. Id. at 2292-93. It is undisputed that Sington, in his various positions as parks manager, mayor's assistant, and parks and recreation director, had authority over Ellen, a secretary, and it is undisputed that Ellen found the conduct to be subjectively offensive. The issue, then, is whether the conduct complained of may be deemed objectively offensive. Mendoza v. Borden, Inc., 195 F.3d 1238, 1245 (11th Cir. 1999)("The employee must 'subjectively perceive' the harassment as sufficiently severe and pervasive to alter the terms or conditions of employment, and this subjective perception must be objectively reasonable.").

The Eleventh Circuit Court of Appeals recently examined this element of a Title VII claim in Gupta v. Florida Board of Regents, 2000 WL 633024 (11th Cir. May 17, 2000). The court recognized that

an essential element of any hostile environment sexual harassment claim is that the conduct complained of be sufficiently "severe or pervasive" to alter the conditions of employment and to create a "hostile or abusive" work environment.  See also Mendoza v. Borden, Inc., 195 F.3d 1238, 1245 (11th Cir. 1999).  Requiring such proof "ensures that Title VII does not become a mere 'general civility code.'" Id. at *7, quoting Faragher, 524 U.S. at 788. Likewise, in Mendoza, the court of appeals explained:

> Although Title VII's prohibition of sex discrimination clearly includes sexual harassment, Title VII is not a federal "civility code."  Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 118 S. Ct. 998, 1000-02, 140 L. Ed. 2d 201 (1998) ("We have never held that workplace harassment, even harassment between men and women, is automatically discrimination because of sex merely because the words used have sexual content or connotations."); Faragher v. City of Boca Raton, 524 U.S. 775, 118 S.Ct. 2275, 2283, 141 L. Ed. 2d 662 (1998) ("A recurring point in these opinions is that 'simple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" (internal citation omitted)); Meritor [Savings Bank, FSB v. Vinson], 477 U.S. at 67, 106 S.Ct. 2399 ("Not all workplace conduct that may be described as 'harassment' affects a 'term, condition, or privilege' of employment within the meaning of Title VII.").

Id. at 1245.  The court in Gupta went on to note that the requirement is critical to prevent the courts from turning ordinary socializing in the workplace into discriminatory conduct.  Id. Such ordinary socializing was deemed to include the "sporadic use of abusive language, gender-related jokes, and occasional teasing"

as well as horseplay and intersexual flirtation.  <u>Gupta</u>, 2000 WL 633024 at *7.

The defendants correctly assert that the Supreme Court has recognized that it is not enough for Ellen to show that her workplace was offensive; rather, she must show that the Noccalula Falls office was so permeated with discriminatory intimidation, ridicule, and insult that a reasonable person would perceive the environment as hostile or abusive.  See <u>Meritor Savings Bank v. Vinson</u>, 477 U.S. 57, 67, 106 S. Ct. 2399, 2405, 91 L. Ed. 2d 49 (1986).

In determining if this critical element of a sexual harassment claim has been met, the court must look to the frequency, severity, and pervasiveness of the conduct complained of.  Again, the court of appeals has said:

> The objective component of this analysis is somewhat fact intensive.  Nevertheless, the Supreme Court and this Court have identified the following four factors that should be considered in determining whether harassment objectively altered an employee's terms or conditions of employment: (1) the frequency of the conduct; (2) the severity of the conduct;(3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance.  <u>Allen v. Tyson Foods</u>, 121 F.3d 642, 647 (11th Cir.1997) (citing <u>Harris</u>, 510 U.S. at 23, 114 S. Ct. 367).  The courts should examine the conduct in context, not as isolated acts, and determine under the totality of the circumstances whether the harassing conduct is sufficiently severe or pervasive to alter the terms or conditions of the plaintiff's employment and create a hostile or abusive working environment. <u>Id.</u>; <u>see</u> <u>Harris</u>, 510 U.S. at 23, 114 S. Ct. 367; <u>Henson</u>, 682 F.2d

at 904; Faragher, 118 S. Ct. at 2283 (citing Harris, 510
U.S. at 23, 114 S. Ct. 367, and explaining that "we
directed courts to determine whether an environment is
sufficiently hostile or abusive by 'looking at all the
circumstances'").

Mendoza v. Borden, Inc., 195 F.3d 1238, 1246 (11th Cir. 1999).

While Ellen does assert that Sington's use of sexual language was

frequent, it is difficult to categorize his conduct, however foul

and inappropriate, as "severe" or "pervasive". While his language

undoubtedly was in poor taste and vulgar, the plaintiff has failed

to show that it rose to the level that a reasonable person would

have perceived as hostile and abusive. There is no allegation or

suggestion that Sington solicited or demanded sexual favors or that

he touched plaintiff in any sexual manner. Even when plaintiff

told him he was "screwing [a screw} wrong" and he replied that no

one had ever told him that before and that he would love to "prove

you wrong," plaintiff took the remark as a joke, not a sexual

solicitation or demand. Even his inquiries about her sex life,

though embarrassing, were flippant and not meant to hurt.

Sington's language was never "physically threatening" or,

apparently, even humiliating. It is undisputed that he told jokes,

often crude and vulgar, to all employees. His jokes were not

directed simply at plaintiff or other female employees for the

purpose of humiliating them. Because his conduct was not aimed

specifically at Ellen, there is nothing that might indicate that

she was a sexual target. The plaintiff has submitted evidence that

proves that Sington simply talked and acted in the vulgar manner about which she complained, and did so around other co-workers, male and female. Furthermore, Ellen has admitted that her response to Sington's foul mouth was simply to tell him to stop. The use of coarse or boorish language has been deemed "too commonplace" in our society to be classified as discriminatory. Gupta, 2000 WL 633024 at *9, citing Minor, 174 F.3d at 858.

Ellen does not allege that Sington ever suggested that she engage in sex with him, or that he ever made any advances or touched her in a sexual manner. The only time she alleges that Sington touched her is when she was in his office resting because of a headache and he rubbed her shoulders. While the court accepts her testimony that Sington's actions made her uncomfortable, the court is not inclined to categorize a single incident of non-sexual touching in more than five years of working together as sexual harassment. The Eleventh Circuit Court of Appeals made clear in Gupta that to constitute sexual harassment, touching must be of a sexual or gender-related nature. Gupta, 2000 WL 633024 at *9. To find otherwise would be to ban from the workplace any of the physical contact that often accompanies workplace friendships and comradery.

Furthermore, there is little or no evidence that Sington's conduct so altered the work environment that it "unreasonably interfered with the employee's job performance." Id. This factor

20

also requires a showing of both subjective and objective interference with the job performance. Id. Ellen does not make any substantial showing that Sington's conduct interfered with her work. The only example Ellen has offered of when Sington's harassment interfered with her work is the day he rubbed her shoulders and she became upset and went home.[5] She maintains, and witnesses on her behalf testify, that Ellen performed well in her position at Noccalula Falls, even while she dealt with Sington on a daily basis in 1995. When Sington told dirty jokes and made the offensive comments, the record indicates that Ellen would tell him to quit and would continue to do her work. After Sington left the Falls park in April 1995, she had less contact with him (usually over the telephone) and almost no direct physical contact. This evidence belies her contention that Sington's conduct was severe and pervasive and unreasonably interfered with her work.

As stated in Gupta, this court has a duty to examine the defendants' conduct to determine whether it meets the "sufficiently severe or pervasive" requirement. Having done so, even taking the plaintiff's allegations as true, the court finds that the alleged harassment in this case is simply not conduct that a reasonable

---

[5]     Ellen's other allegations of emotional distress are linked to her change in job duties and pay, and may be relevant to her retaliation claim, but are not considered in relation to whether the sexual harassment was so severe or pervasive that it permeated her work environment and unreasonably interfered with her work performance.

person would view as so severe or pervasive as to alter Ellen's working conditions and warrant redress.

It has been noted that Title VII may not be used as a tool to punish "the ordinary tribulations of the workplace," <u>Faragher</u>, 524 U.S. at 788, or failure to treat a female employee with "sensitivity, tact and delicacy," <u>Minor v. Ivy Tech State College</u>, 174 F.3d 855, 858 (7th Cir. 1999). Moreover, the court is not permitted to police language in the workplace under the guise of enforcing Title VII. Consequently, because the plaintiff has failed to demonstrate that the conduct complained of is sufficiently "severe or pervasive" to support a Title VII action, and because the defendant's conduct did not "unreasonably interfere" with Ellen's job performance, the defendants' motion for summary judgment is due to be granted as to plaintiff's Title VII hostile environment claims.


### 3.  Affirmative Defense

In addition to plaintiff's failure to make a sufficient showing of a hostile or abusive work environment, the defendant City of Gadsden[6] also seeks a dismissal of Ellen's sexual harassment claims based on the affirmative defense set forth by the

---

[6]  Of course, only plaintiff's employer, the City of Gadsden, may be sued under Title VII. Sington individually has no potential liability under Title VII.

Supreme Court in <u>Faragher</u> and <u>Ellerth</u>.   The city argues that there is no genuine issue of material fact regarding its exercise of reasonable care to prevent and correct sexual harassment in the workplace because it had policies and procedures in place to address the issue and Ellen unreasonably failed to take advantage of the policy by declining to report the offensive conduct to management.

Although Ellen has testified that she was not informed of the sexual harassment policy and that her failure to report the conduct to management was not "unreasonable," the city has presented evidence that it took steps in 1992 to forbid sexual hararssment in the workplace and to institute procedures for employees to complain about prohibited harassment.  Again, although Ellen did not receive a copy of the policy, there is undisputed evidence that the city distributed copies of the policies to all employees with their paychecks at least once annually between 1993 and 1997.  Further, there is evidence that management employees, including Singleton, were sent to at least two sexual harassment sensitivity training seminars at Auburn University.  While the court must accept Ellen's testimony that she did not receive a copy of the policy and was unaware of it, this does not undermine the conclusion that the city took reasonable steps to create a policy and to communicate it to its workforce.  The fact that one or two employees failed to learn

23

about the policy does not mean that the city's efforts were notreasonable.

Furthermore, it is undisputed that plaintiff did possess a copy of the employee handbook containing the more general anti-discrimination policy of the city, quoted herein above, and the procedures for filing a discrimination grievance.  That policy expressly prohibited discrimination on the basis of sex and provided for both informal and formal complaint procedures for resolution of discrimination complaints.

It is undisputed that plaintiff never filed, formally or informally, any complaint regarding Sington's alleged harassment. Indeed, she never mentioned it to any city management employee until *after* she resigned, even though she met several times with Sington, Personnel Director Gladden, and union representatives before she resigned.  Ellen does not assert that anyone or anything prevented her from complaining about the alleged harassment to Gladden or to any other supervisory employee.  She merely testified that Abrahams, whom she contacted as a friend, told her there was no policy prohibiting sexual harassment.

As a threshold for asserting the affirmative defense, the employer must show that the employee suffered no adverse employment action as a result of refusing or rejecting the sexual harassment. It appears to be undisputed here that plaintiff suffered no adverse

employment action during any period of her employment.  While
Sington worked directly with her at the Falls park in 1995,
plaintiff continued to receive raises and increased job
responsibilities.  After Sington left to become a mayor assistant,
plaintiff continued to receive pay increases, including
supplemental pay, at first during only the busy summer months, but
later during the entire year.

Only when Sington became acting parks and recreation director
in February 1998 and undertook, at the mayor's direction, a
reorganization of the department did plaintiff's job become the
subject of discussion.  There simply is no evidence, however, that
the reorganization was intended to punish Ellen for rejection of
Sington's alleged harassment.  The reorganization was initiated on
the mayor's instruction; it resulted in the reclassification of a
number of parks and recreation employees, not just plaintiff.
Plaintiff's reclassification to facilities manager II cannot be
regarded as a demotion, even though it may have resulted in
decreased pay, because she previously was classified only as a
secretary.  See Plaintiff's Exhibit 1.  Her employment
responsibilities were at the least the same, if not greater, than
in her secretarial classification. The decrease in pay was the
result of the elimination of the supplemental pay she received,
which was initially intended to compensate her for overtime.
Personnel Director Gladden testified that, if she worked overtime

25

in her new classification, her overtime pay would compensate for the loss of the supplemental pay she had been receiving.  Thus, the reclassification simply was not an adverse employment action.

Even if one could regard the reclassification as a adverse employment action, there is no evidence of any causal link between it and the alleged harassment.  At the time Sington became acting parks and recreation director, he had not worked directly with plaintiff on a daily basis for almost three years.  Although plaintiff testified that Sington continued to make vulgar jokes to her in telephone conversations, there is no evidence that her protests or rejection of his comments were the basis for the *mayor's decision* to reorganize the entire department.  Furthermore, although plaintiff says that she was threatened with transfer to the Carver Community Center on the night shift, it is clear that never occurred.  Thus, the court concludes that there is no genuine issue of fact on which a reasonable jury could find that plaintiff suffered an adverse employment action due to the alleged harassment.

To establish the affirmative defense, the employer must show that it took reasonable steps to prevent and correct sexual harassment and that the employee unreasonably failed to utilize corrective processes available to her.  "When no such tangible employment action occurs, however, the employer's vicarious

liability is subject to a two-part affirmative defense: the employer can escape liability by demonstrating (a) that it took reasonable steps both to prevent sexual harassment and to remedy the sexually harassing conduct promptly once it was brought to the employer's attention, and (b) that the victimized employee unreasonably failed to avoid harm or utilize any remedial opportunities made available by the employer." Dees v. Johnson Controls World Service, 168 F.3d 417, 421 (11th Cir. 1999) (citing Ellerth v. Burlington Industries, 524 U.S. 742, 118 S. Ct. 2257, 2270, 141 L. Ed. 2d 633 (1998) and Faragher v. City of Boca Raton, 524 U.S. 775, 118 S. Ct. 2275, 2292-93, 141 L. Ed. 2d 662 (1998)).

The court concludes that the defendant city did take reasonable steps to prevent and remedy sexual harassment by instituting an anti-harassment policy at the city council level and by distributing that policy to employees, even though plaintiff somehow failed to receive a copy. The city sent its managers to sexual harassment training and the undisputed evidence showed that, when complaints were filed, they were investigated and, when appropriate, employees were disciplined for harassing conduct. Thus, the first prong of the defense was met.

The second element focuses on whether the employee unreasonably failed to avail herself of remedial opportunities available to her. Plaintiff argues here that she did not know about the policy and for that reason did not use it. Nonetheless,

27

there is evidence that plaintiff knew that *some* corrective process was available to her.  While not explicitly dealing with sexual harassment, the employee handbook contained an anti-discrimination policy and procedures for resolving discrimination grievances. Whether prompted by that policy or not, plaintiff called a friend, Susan Abrahams, in the *city's personnel department* to seek advice. She claims Abrahams told her that no policy existed and that she should do nothing.  This does not reasonably explain plaintiff's failure to contact the personnel director for advice or, for that matter, why she did not seek the assistance of her supervisor, Jerry Alford.  There is no evidence that Abrahams had any authority to speak for the city, much less to nullify the efforts of the city to establish an effective anti-harassment policy by telling plaintiff, incorrectly, that no policy existed.  Although plaintiff sought out city councilman Reed to complain to, she did not take her complaints to any of a number of city managers who had the authority to take steps to resolve the matter.  Councilman Reed testified that there was nothing he could do because he was not involved in the daily management of the city, which was handled by the mayor.  In short, even though plaintiff did not know about the anti-harassment policy, she did know about the anti-discrimination policy in her handbook and that she could complain about the conduct she viewed as offensive.  Despite that, she did not bring

her complaints to anyone's attention until after she resigned, when it was too late.

Thus, the court agrees that plaintiff unreasonably failed to bring her complaints to the attention of the city and to avail herself of remedial opportunities made available by the city. Because the defendant city has carried its burden of establishing its entitlement to the Ellerth affirmative defense as a matter of law, the city's motion for summary judgment will be granted on this alternative basis.


### 4.  *Quid Pro Quo* Harassment

The plaintiff states a claim for *quid pro quo* harassment in Count One of her complaint.  Such a claim requires a showing of "threats [of adverse employment actions] which are carried out." Gupta, 2000 WL 633024 at *6.  Even construing the evidence in the light most favorable to the plaintiff, there is a complete absence of any evidence to support this claim, as discussed extensively above.  The plaintiff has admitted that her acquiescence to the harassing conduct was never made a condition to a job benefit or the cause of a job detriment.  Ellen admits that Sington never made to her any sexual demands or requests of any type.  As a result, the defendants' motion for summary judgment on plaintiff's claim of *quid pro quo* harassment is due to be granted.

29

## B.  **Retaliatory Discharge**

### 1.  Causal Connection

The plaintiff has asserted that after she complained about Sington's conduct, Sington changed her job duties and decreased her pay in violation of 42 U.S.C. § 2000e-3(a).  The defendants seek summary judgment on plaintiff's claim that she was retaliated against, attacking plaintiff's case on grounds that Ellen has failed to establish that there is a causal connection between any protected activity[7] and any adverse employment action.

To establish a *prima facie* case of retaliation under Title VII, the plaintiff must show that: (1) she engaged in a protected activity by opposing Title VII discrimination; (2) she suffered an adverse employment action; and (3) the adverse action was causally connected to the protected activity.  See, e.g., Farley v. Nationwide Mut. Ins. Co., 197 F.3d 1322, 1336 (11th Cir. 1999).  The causal link requirement is to be construed broadly, and the

---

[7]  It is not entirely clear what plaintiff's counsel asserts Ellen did that would constitute a "protected activity."  It appears that the plaintiff relies on three actions: (1) her 1995 comment to Alford that she was glad Sington was gone because she didn't like his "dirty mouth," (2) her consistent response to the comments, which was to tell Sington to stop, and (2) her 1998 conversation with a Gadsden City Council member.  Assuming, without deciding, that these actions rise to the level of a "protected activity," the plaintiff's retaliation claim still must fail for the reasons discussed herein.

Eleventh Circuit Court of Appeals has stated that "a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated." <u>Olmsted v. Taco Bell Corp.</u>, 141 F.3d 1457, 1460 (11th Cir. 1998), quoting <u>EEOC v. Reichhold Chem., Inc.</u>, 988 F.2d 1564, 1571-72 (11th Cir. 1993). However, to meet even this low threshold of proof of causation, the plaintiff must offer some evidence from which a jury could infer that Ellen's complaints about Sington caused the decrease in her pay and change in her duties.  "At a minimum, a plaintiff must generally establish that the employer was actually aware of the protected expression at the time it took adverse employment action. The defendant's awareness of the protected statement, however, may be established by circumstantial evidence." <u>Clover v. Total System Services, Inc</u>, 176 F.3d 1346, 1354 (11th Cir. 1999) (citing <u>Goldsmith v. City of Atmore</u>, 996 F.2d 1155, 1163 (11th Cir. 1993)). It is on this third element of the *prima facie* case that the plaintiff fails to meet her burden.

Assuming that Sington's decision to reorganize the parks and recreation department, as part of which plaintiff was reclassified to facilities manager II, constitutes the act of plaintiff's employer, the change in duties occurred three years after the plaintiff told Alford that she didn't like Sington's language. Such an attenuated temporal relationship generally belies the

31

assertion of causation.  See, e.g., Maniccia v. Brown, 171 F.3d 1364, 1370 (11th Cir. 1999) and cases cited therein.  During the three years that elapsed between the comment to Alford and the adverse job action, Sington and the plaintiff apparently dealt with each other on a regular basis without any retaliatory incident.

Ellen also testified that she opposed the alleged harassment by continually telling Sington to stop making vulgar jokes and comments.  Therefore, if her statements constitute "opposition" to the harrasment, they too occurred years before the alleged retaliation.[8]  These facts relating to the timing of her comments and protestations suggest that there is no causal link between the protected activity and the adverse job action.

Ellen also has failed to show any causative link between her complaint about Sington's conduct to a city council member and the adverse job action.  To survive summary judgment, a plaintiff must show more than "mere curious timing coupled with speculative theories."  Raney v. Vinson Guard Serv. Inc., 120 F.3d 1192, 1197 (11th Cir. 1997) citing Goldsmith v. City of Atmore, 996 F.2d 1155, 1163 (11th Cir. 1993).  Summary judgment cannot be avoided by arguments "based on hunches unsupported with significant probative

---

[8]     The court recognizes that Ellen could attempt to explain the time lapse by claiming Sington did not have the power to retaliate until he assumed the manager job in 1998; however, that position would be inconsistent with other testimony that she was forced to deal with him on a frequent basis because his position as a mayoral assistant gave him authority over her.

evidence." <u>Raney</u>, 120 F.3d at 1198.   Furthermore, to establish causation the plaintiff must, at the least, establish that the employer was "actually aware" of the plaintiff's protected activity at the time that it took the adverse action.   <u>Quillen v. American Tobacco Co.</u>, 874 F. Supp. 1285, 1294 (M.D. Ala. 1995).

In this case, Ellen alleges that because of the "grapevine" at City Hall, everyone (presumably including the mayor) knew shortly afterward that she had talked to Ben Reed.   There is no evidence, however, that Reed told anyone about the meeting, and the mayor has denied, without any disputing evidence, ever knowing about her conversation with Reed.   <u>See</u> Plaintiff's Exhibit 8, p. 26. Likewise, Singaton has testified without dispute that he never knew of plaintiff's conversation with Ben Reed.   <u>See</u> Singaton's Deposition, attached to Defendants' Motion for Summary Judgment, pp. 26-27.   The only evidence the plaintiff relies upon to show that the defendants knew about her complaint prior to taking the adverse job action is testimony from Jerry Alford, who was retired when the meeting with Reed took place.   In response to a question whether he, Alford, knew Ellen had met with Reed, he said:

> I have heard that she - this is back when all of this was going on - that she talked to Ben Reed.  I can't remember who told me. I don't think she told me.  I heard about - that she had talked to him and that his words were, "if something else happens, let me know," or something like that.  I don't think he proceeded with anything.  That's all I know about that.

When asked more details about the meeting with Reed, Alford explained that he didn't know when or from whom he heard about it, but that it probably went through the city hall "grapevine," and he might have heard it from his former secretary, whom he visited "every few weeks" at city hall.

The evidence offered by Ellen fails to support her contention for two reasons: (1) the allegation is hearsay, and vague hearsay at that, and (2) the statement doesn't support the conclusion that the <u>defendants</u> knew about the "protected activity" <u>before</u> they took the alleged retaliatory action.  Ellen is never clear as to when she met with Reed.  She  admits, however, that she saw Reed only <u>after</u> she had learned that her job duties might be changed and her pay might be cut.  This admission leads to the conclusion that the adverse job action, or at least the decision to take such action, was made prior to the protected activity of speaking to Reed. Consequently, there can be no causal relationship.

Further, even if one can accept that the Alford learned of the meeting through the city hall "grapevine," this falls far short of establishing the possibility that either the mayor of Sington heard about it.  Absent some evidence that someone told the decision-makers about the meeting with Reed, or some evidence that the decision-makers have admitted knowing about it, there simply is no factual basis for concluding that they did.  To so conclude is more than relying on circumstantial evidence (of which there is none),

34

it is plain speculation.  There is no evidence that the city, either in the form of the mayor, Sington, or any other management employee, was aware that plaintiff had complained to Ben Reed.

Ellen also avers in her declaration, although apparently no mention is made in her deposition, that Sington told her he knew she had been to see a lawyer.  While such a statement, if true, is troubling, it also was made after Ellen was told her job duties would be changed and her pay would be decreased.  None of the alleged facts that Ellen uses to support her retaliation claim occurred before Sington made the decision to restructure the department and reclassify her position; therefore, no facts support her contention that her complaint caused any adverse employment action.  Because Ellen has failed to provide "significant probative evidence" of causation, she cannot establish a *prima facie* case and the defendants' motion for summary judgment on plaintiff's Title VII retaliation claim is due to be granted.


### 2.  Pretext

Even if the plaintiff had succeeded in establishing a *prima facie* case, the presumption of discrimination may be rebutted if the employer offers a legitimate, nondiscriminatory reason for the employment action.  Once the employer meets its burden of articulating a non-discriminatory reason, the burden shifts back to

35

the plaintiff to show that the reason is either not worthy of belief or that, in light of all the evidence, a discriminatory reason more likely motivated the decision than the proferred reason.  Standard v. A.B.E.L. Servs. Inc., 161 F.3d 1318, 1331-33 (11th Cir. 1998), citing Combs v. Plantation Patterns, 106 F.3d 1519, 1528 (11th Cir. 1997), cert. denied, 118 S. Ct. 685, 139 L. Ed. 2d 632 (1998).

Because the defendants have offered a nondiscriminatory reason for the reclassification, that is, a complete restructuring of the parks and recreation department, to overcome the motion for summary judgment, Ellen must demonstrate by competent, admissible evidence that the defendants' nondiscriminatory reason is merely a pretext to retaliate against her.  She must show not only that the articulated reason is false, but also that the defendants' true reason for the reclassification was retaliation.  See Clark v. Coats & Clark, Inc., 990 F.2d 1217, 1228 (11th Cir. 1993).  It is not the duty of this court to evaluate whether the decision to reclassify Ellen was fair or wise; employers are free to make unfair or unwise employment decisions so long as they do not violate anti-discrimination statutes.  See Elrod v. Sears, Roebuck and Co., 939 F.2d 1466, 1470 (11th Cir. 1991).

The plaintiff attempts to show that the proffered reason is a sham essentially by pointing to the same evidence she claims supports causation.  She makes conclusory statements to that effect

36

in her brief in opposition to the motion for summary judgment; however, no fact in evidence logically calls into question the credibility of the articulated nondiscriminatory reason.  Without recounting all that evidence, it suffices to recall that it was the mayor who initiated the reorganization and that neither he nor Sington was aware of any sexual harassment complaints plaintiff had made to anyone.

The court's job is to consider whether the evidence "presents a sufficient disagreement to require submission to a jury."  Combs, 106 F.3d at 1526.  The court finds no substantive support for Ellen's argument that the reorganization of the department was a pretext.  All of the specific evidence indicates that the reorganization was department-wide and was made due to concerns wholly separate from Ellen's opposition to Sington's conduct.  In the instant case, Gadsden's mayor has testified that the reorganization of the department was instituted at his request. The mayor also had questioned Ellen's receipt of the supplemental pay on a year-round basis.  It is undisputed that the reorganization affected many, if not all, of the department's employees, and that the city received complaints from workers other than Ellen about Sington's far-reaching changes.  There is simply no evidence to show that the reorganization was not what it appeared to be: an across-the-board streamlining of the parks

37

department, which involved employees being given new titles, new duties, and transfers.

Ellen argues that because the tennis complex manager did not receive a cut in pay, her pay cut was retaliatory.  However, because there is virtually no correlation between the two employees - she was a secretary, he was a teaching tennis professional - this argument is unavailing.

Consequently, the court finds that Ellen has failed to meet her secondary burden of showing that the defendants' stated reason for changing Ellen's pay and duties was pretextual, and Ellen's claim of retaliation is subject to summary judgment in favor of both defendants.


### C.  Sex Discrimination

Ellen also asserts that her reclassification was a product of impermissible sex discrimination.  The only evidence she offers in support of that claim is that the male tennis complex manager, who also was reclassified, did not receive a cut in pay.  He was a tennis professional who managed the tennis complex and taught lessons.  She was a secretary who received extra compensation for handling extra responsibilities.  The analysis clearly requires an apples-and-oranges comparison and does not warrant discussion.

In her deposition, Ellen also states that she was discriminated against by not being promoted to the job of personnel director when Jerry Gladden was given that position. There is no evidence that Ellen actually applied for the job, and her only evidence in support of this claim is that Gladden, the male who received the job, told her that she could do his job and that he didn't know why she wasn't in that job. Such friendly banter hardly amounts to evidence of gender discrimination. Accordingly, the defendants' motion for summary judgment on plaintiff's sex discrimination claim is due to be granted.

### D. Outrage

The plaintiff states a claim based on Alabama law for the tort of outrage. The tort was first recognized by the Alabama courts in American Road Service Company v. Inmon, 394 So. 2d 361 (Ala. 1980). Since then, the Alabama Supreme Court has repeatedly made clear that a remedy is reserved for only the most egregious conduct, conduct that is both "extreme" and "outrageous" and that goes "beyond all possible bounds of decency" so as to be "atrocious and utterly intolerable in a civilized society." See, e.g., Jackson v. Alabama Power Co., 630 So. 2d 439, 440 (Ala. 1993); Thomas v. BSE Indus. Contractors, Inc., 624 So. 2d 1042, 1044 (Ala. 1993). Conduct which is not sufficiently severe or pervasive as to

39

constitute sexual harassment certainly cannot be deemed to rise to the level of egregiousness required to sustain a claim of outrage under Alabama's strict standard.  See, e.g., Shepherd v. Summit Mgt. Co., 726 So. 2d 686, 694 (Ala. Civ. App. 1998).

Plaintiff's outrage claim fails to survive the defendants' motion for summary judgment for a second reason.  Not only must the conduct that prompts an outrage claim be deemed egregious, the emotional distress that results also must be so extreme that "no reasonable person could be expected to endure it."  Potts v. Hayes, 2000 WL 548198 at *3 (Ala. May 5, 2000).  Ellen asserts that she cried, and had trouble sleeping and working after the reclassification.  She does not report any similar reaction to Sington's language.  In any event, Ellen's distress is not the kind of "extreme emotional distress" required to sustain an outrage claim.  Consequently, the defendants' motion for summary judgment on Ellen's outrage claim is due to be granted.

### E. Negligent/Malicious Supervision

The City of Gadsden's argument in support of its motion for summary judgment on plaintiff's negligent supervision claim is twofold: (1) that the claim is barred as to the 1995 actions by the applicable statute of limitations; and (2) that the plaintiff has failed to establish that the city had notice of Sington's

incompetence.   Because  the  court  finds  that  the  negligent
supervision  claim  fails  on  substantive  grounds,  the  issue  of  the
time bar is irrelevant.

A  negligent  supervision  claim  is  just  another  species  of
negligence,  requiring  that  the  plaintiff  demonstrate  both  a  duty,
a  breach,  and  an  injury.   In  this  case  the  plaintiff  has  failed  to
demonstrate  that  the  city  had  any  duty  under  state  law  to  provide
the  plaintiff  with  a  workplace  free  from  dirty  jokes  or  vulgar
language.    In  the  absence  of  such  a  duty,  there  can  be  no
negligence.

Even  if  the  employer  had  a  state-law  duty  to  provide  the
plaintiff  a  workplace  free  from  such  conduct,  the  plaintiff  has
failed  to  show  that  the  city  breached  that  duty.   Although  the
plaintiff  has  come  forth  with  evidence  that  managers  within  the
city  knew  that  Sington  told  dirty  jokes  to  employees,  there  is  no
evidence  that  the  city  was  on  notice  that  the  jokes  violated  some
right  of  the  plaintiff.    The  defendants  have  shown  that  no
employee,  including  the  plaintiff,  ever  lodged  a  complaint  against
Sington,  and  that  he  told  his  jokes  to  male  and  female  employees
alike.   Just  as  the  conduct  in  question  is  not  sufficiently  severe
to  constitute  outrage  under  state  law  or  actionable  harassment
under  federal  law,  there  is  insufficient  evidence  to  show  that
Sington's  conduct  was  of  the  nature,  character,  or  frequency  that

41

the city knew that Sington's conduct rendered him "incompetent," triggering any duty.

The plaintiff further argues that the fact that the mayor consciously chose not to publish the sexual harassment policy in the employee handbook is evidence of negligent supervision. However, the mayor offered a reason for the policy's exclusion, and the defendant has asserted that it was city policy to distribute the policy with paychecks on a yearly basis. Even though Ellen testifies that she never received the policy, there is no requirement that an employer's sexual harassment policy be distributed in any particular manner, and there is testimony that the city's policy was available to Ellen in the workplace. Consequently, the city's motion for summary judgment on plaintiff's negligent supervision claim[9] is due to be denied.

**F.  Constructive Discharge**

Although the plaintiff argues Title VII law in her opposition to the defendants' motion for summary judgment on the constructive discharge claim, the complaint makes clear that Ellen's

---

[9]      The plaintiff also asserts that the city is liable for wanton or malicious supervision.  However, plaintiff's allegations that the city acted wantonly or willfully are not supported by the evidence, as there is no evidence that the city knew or was conscious of the likelihood that Sington's comments and jokes would result in plaintiff's injury.

constructive discharge claim is brought pursuant to state law. Under Alabama law, absent special circumstances, employment is deemed "at-will."  Consequently, no action for a constructive discharge is recognized except where the employee leaves as a result of conduct violative of Title VII or Alabama Workers Compensation statutes.  See, e.g., Shepherd v. Summit Mgt. Co., Inc., 726 So. 2d 686, 693 (Ala. 1998); Irons v. Service Mdse. Co., 611 So. 2d 294, 295 (Ala. Civ. App. 1992) citing Twilley v. Daubert Coated Products, Inc., 536 So. 2d 1364 (Ala. 1988).  In this case, the court has found no conduct violative of Title VII, and plaintiff does not allege any claims related to the workers compensation laws.  Consequently, plaintiff's claim for constructive discharge is without merit under state law.

Even if the court construes plaintiff's constructive discharge claim to be based on Title VII rather than state law – despite the clear wording of the complaint – it still fails.  It is undisputed that plaintiff resigned voluntarily.  For all the reasons already discussed, plaintiff's work environment was not hostile or abusive, much less so hostile or abusive that a reasonable person could not be expected to tolerate it.  Plaintiff was not constructively discharged; she resigned.  Defendants' motion for summary judgment on this claim is due to be granted.

43

## IV.   CONCLUSION

Accordingly, consistent with the foregoing discussion of the evidence presented by both parties in support of and in opposition to the motion for summary judgment, this court determines that there are no genuine issues of material fact and that defendants are entitled to judgment as a matter of law.   Defendants' motion for summary judgment against plaintiff is due to be granted as to plaintiff's claims for Title VII claims of sexual harassment and retaliatory discharge, and state law claims of outrage, negligent or malicious supervision and constructive discharge.   Consequently, all of plaintiff's claims are due to be dismissed with prejudice.

A separate order will be entered in accordance with the findings set forth herein.

Dated the 28ᵗʰ day of July, 2000.

T. MICHAEL PUTNAM
CHIEF MAGISTRATE JUDGE